**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANINDO DEY,

                **Plaintiff,**

        **v.**

INNODATA INC.,

                **Defendant.**

**Civil Action No.: 18-0978 (ES) (MAH)**

**OPINION**

SALAS, DISTRICT JUDGE

Plaintiff Anindo Dey sues his former employer, Innodata Inc., a digital services company, under federal and state law for alleged discrimination he experienced because of his race and national origin and for allegedly retaliating against him for reporting the discrimination. (D.E. No. 1 ("Complaint" or "Compl.")). Before the Court are Defendant's motion for summary judgment (D.E. No. 104 ("SJ Motion")), and a related motion by Plaintiff to strike certain evidence submitted in support of the SJ Motion (D.E. No. 108 ("Motion to Strike")). Having considered the parties' submissions, the Court decides this matter without oral argument. Fed. R. Civ. Pro. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court GRANTS-IN-PART and DENIES-IN-PART the SJ Motion. Because the Court need not resolve Plaintiff's evidentiary challenges to decide the SJ Motion, the Motion to Strike is denied *without prejudice* to Plaintiff's right to oppose introduction of the challenged evidence at a later stage of the litigation.

## I.    BACKGROUND[1]

Dey was an employee at Innodata from 2013 to 2016.  (Def. Reply SUMF ¶ 2).  In July 2013, Dey began working for Innodata Private Limited, Innodata's subsidiary, as Vice President of Business Development in Noida, India.  (*Id.* ¶¶ 14–15).  As Vice President of Business Development Dey "was responsible for building sales in the U.S. for services that Innodata provided such as digital content."  (*Id.* ¶ 16).  Dey originated one client, Book Dogs Books, for Innodata while in India, which generated approximately $500,000 in revenue in or around 2013. (*Id.* ¶ 17).  After some time in India, Dey requested a transfer to North America because he thought relocating would help him generate new business.  (*Id.* ¶ 19).  In February 2016, Innodata sponsored Dey's relocation to the United States.  (*Id.* ¶ 20).  Innodata loaned Dey $6,250.00 to assist with his move to the United States, and in exchange, Dey agreed to repay the loan with interest at the rate of 3.5% per annum on the unpaid balance.  (*Id.* ¶¶ 22–25; *see also* D.E. No. 104-4, Abuhoff Decl., Exhibit C ("Promissory Note")).  The Promissory Note was due and payable in 48 equal installments of $135.00, payable twice monthly as an automatic salary reduction from each period beginning March 2016.  (Def. Reply SUMF ¶ 26).  However, the Promissory Note became immediately due and payable if Innodata no longer employed Plaintiff, for any reason, whether voluntary or involuntary.  (*Id.* ¶ 27).

Once in the United States, Dey worked in a new role as a Client Partner, working out of a home office in Illinois while reporting to Innodata's headquarters in Hackensack, New Jersey.  (*Id.* ¶ 20).  As a Client Partner, Dey's job responsibilities included, *inter alia*, "orchestrating company resources, in the response and delivery of Innodata services, to information services companies

---

[1]    The Court pulls the relevant background facts from the parties' statements of material facts.  (D.E. Nos. 104-2 ("Def. SUMF"), 107-4 ("Pl. Resp. SUMF"), 107-5 ("Pl. Supp. SUMF"), 114 ("Def. Reply SUMF") &114-1 ("Def. Resp. SUMF").  The final submissions (Def. Reply SUMF & Def. Resp. SUMF) include all relevant statements and responses from previous submissions.  For ease of reference, the Court primarily cites to those all-inclusive documents.

and data-driven enterprises"; "[b]uilding, enhancing and executing long term client relationships and communication at the C-level, with other key executives and key decision makers"; "[q]ualify[ing] client specific opportunities and develop[ing] pipeline jointly with the Business Units"; and "[h]elp[ing] to win new business with high level relationships, sales and negotiation skills and client-oriented communications." (*Id.* ¶ 31). In his role as Client Partner, Dey reported to Lisa Indovino, a Senior Vice President of the company. (*Id.* ¶¶ 4 & 34).

Dey, who is of Asian ethnicity and Indian origin, claims that Indovino discriminated against him because of his national origin, ethnicity, and race. (Compl. ¶¶ 16 & 41–56). Dey states that Indovino's discriminatory and harassing nature directed towards him included, *inter alia*, criticism, a "hostile, degrading, derogatory, and intimidating" tone, "verbal berating," and "screaming at him" for most actions he took. (Pl. Supp. SUMF ¶¶ 17, 20 & 21).[2] According to Dey, Indovino's criticism of him had "strong racist overtones." (*Id.* ¶ 21). Dey also claims that Indovino made derogatory comments related to ethnicity and national origin: she commented on the inability of the Asian operations team to conduct business coherently, stated that she loathes the fact that the delivery centers are in Asia and that this location was the core of the problem, stated that she "can barely understand" what the offshore teams say on phone calls, and on one occasion, as Dey was in the middle of an explanation, she complained that "this explanation is too long and you Indians have no ability to speak in short sentences clearly." (*Id.* ¶¶ 18, 19, 22 & 24). According to Dey, Indovino's hostile tone "was directed solely at Dey and people of his national origin, race, and/or color." (*Id.* ¶ 24).

---

[2]     Innodata lodged objections to these and numerous other facts in Dey's supplemental statement of material facts. (Def. Resp. SUMF). Innodata correctly points out that in granting Innodata leave to file for summary judgment, the Court stated that the parties were bound by the statements of fact previously submitted to the Court in connection with the request for leave to file. (D.E. No. 101). And Innodata also correctly points out that Dey's supplemental statement of facts is different from his previous submission. (*Compare* D.E. No. 100-2, *with* Pl. Supp. SUMF). Nevertheless, because Innodata had the opportunity to respond to and dispute the revised supplemental facts, the Court considers them.

On September 12, 2016, Dey emailed Innodata's CEO, Jack Abuhoff, to complain about the way Indovino was treating him. (Def. Reply SUMF ¶ 50). In response to Dey's email, Abuhoff retained Verita, LLC, an independent investigation company, to investigate Dey's claims. (*Id.* ¶ 56; Def. Resp. SUMF ¶ 26). While the investigation was ongoing, Abuhoff gave Dey the option to be assigned to different responsibilities outside of Indovino's domain and informed Dey that the director of Human Resources would join calls between Dey and Indovino. (Def. Reply SUMF ¶¶ 53 & 54). Dey opted to keep his current responsibilities, thus staying within Indovino's domain. (*Id.* ¶ 54).

Jacqueline Sacus conducted the investigation on behalf of Verita. (*Id.* ¶ 57). Sacus interviewed six Innodata employees, including Dey and Indovino. (*Id.* ¶ 58). Sacus generated a report based on the investigation. (Abuhoff Decl., Exhibit I ("Verita Report")).[3] After the investigation, Innodata claims that Abuhoff spoke to Dey to discuss both the investigation and Dey's inadequate performance; Abuhoff also offered to provide Dey with coaching and requested that Dey schedule a follow-up meeting. (Def. Reply SUMF ¶¶ 77–78).[4] According to Abuhoff, Dey never scheduled the follow-up meeting. (*Id.* ¶ 81). According to Dey, however, there was no

---

[3]    Innodata submitted the Verita Report as an attachment to Abuhoff's declaration. Dey challenges the admissibility of the Verita Report in his Motion to Strike, arguing that "Innodata cannot introduce evidence sufficient to support a finding that Abuhoff has personal knowledge of the report or Sacus's findings, as the findings are all based on hearsay if used by Innodata for the truth of the matter asserted." (Motion to Strike at 3). For purposes of this Background section, the Court does not consider the Verita Report for the truth of the matter asserted therein, but rather for the fact that these are the results and findings that were provided to Innodata. Moreover, throughout the Opinion, the Court references certain arguments by Innodata which rely on the facts presented in the Verita Report. (*See, e.g.*, Section III.A.ii *supra*). The Court does so without resolving the parties' dispute on this issue because even if the Court could consider the facts asserted in the Verita Report, it would not change the outcome.

[4]    In support of these facts, Innodata cites to Exhibit J to the Abuhoff Declaration, which contains an email from Abuhoff to Marcia Novero attaching "notes to file." Abuhoff explains in the email that the attached notes are from his conversation with Dey on Friday, November 4, 2016. (D.E. No. 104-4 at 80 (ECF Pagination)). Dey challenges the admissibility of the notes as inadmissible hearsay. For purposes of this Background section, the Court does not accept or reject the evidence submitted in support of these facts.

discussion, and Abuhoff never offered to provide coaching in the first place.  (*Id.* ¶¶ 77–78 & 81; Def. Resp. SUMF ¶ 43).

On November 8, 2016, Dey filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Def. Reply SUMF ¶ 83).  The following day, Dey presented to the emergency room complaining of chest tightness, and he underwent heart surgery.  (*Id.* ¶ 71; Def. Resp. SUMF ¶¶ 47–48).  According to Dey, the stress caused by Indovino led to him suffering a heart attack.  (Def. Reply SUMF ¶ 76).  And Dr. Rajat Deo, MD, MTR opined, to a reasonable degree of medical certainty, that Dey's stress-induced state of mind and emotional/psychological status contributed to his acute presentation with unstable angina.  (Def. Resp. SUMF ¶ 53; D.E. 107-1, Nitschke Decl., Exhibit C at 4).  As a result of the surgery, Dey took ten days off from work in order to recover.  (Def. Reply SUMF ¶ 72).

Shortly after his return to work, on December 21, 2016, Innodata terminated Dey from his employment.  (*Id.* ¶ 82).  According to Innodata, it terminated Dey because of his poor performance.  (*Id.*).  Dey, however, believes that his termination was an act of discrimination against him based on his race and national origin and/or that he was retaliated against in response to his complaints of discrimination.  (*See generally* Compl.).

On July 28, 2017, Dey filed suit against Innodata bringing claims for: (i) discrimination based on national origin pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. (Count I); (ii) discrimination based on race and ethnicity under Title VII (Count II); (iii) violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA") (Count III); (iv) retaliatory discharge under Illinois common law (Count IV); (v) discrimination based on national origin, race and/or color under the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. Ann. 5/6-101(A) (Count V); and (vi) violations of the Illinois

Whistleblower Act ("IWA"), 740 ILCS 174/20 (Count VI).  (Compl. ¶¶ 42–89).  Dey filed the Complaint in the Northern District of Illinois, but the case was transferred to this District upon Innodata's motion.  (D.E. Nos. 9 & 35).  Innodata answered the Complaint and later asserted counterclaims for breach of contract, unjust enrichment, and promissory estoppel based on Dey's failure to repay the Promissory Note.  (D.E. No. 82, Amended Answer to Complaint, Counterclaim).  The case proceeded to discovery, and on June 22, 2020, Innodata filed the instant motion for summary judgment, seeking judgment on all of Dey's claims and on its counterclaims. (*See generally* SJ Motion).  Dey opposes the SJ Motion and moves to strike some of Innodata's evidence submitted in support.  (D.E. No. 109-1 ("Pl. Opp. Br."); Motion to Strike).

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The mere existence of an alleged disputed fact is not enough. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247 (1986).  Rather, the opposing party must prove that there is a genuine dispute of a material fact.  *Id.* at 247–48.  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  A fact is "material" if under the governing substantive law, a dispute about the fact might affect the outcome of the lawsuit.  *Id.*  Factual disputes that are irrelevant or unnecessary will not preclude summary judgment.  *Id.*

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324.  To meet its burden, the nonmoving party must offer specific facts that establish a

genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Thus, the nonmoving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the nonmoving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

### III.   DISCUSSION

#### A.   Title VII Claims

In Counts I and II of the Complaint, Plaintiff alleges claims for Title VII discrimination based on his race, ethnicity, and national origin. Defendant moves for summary judgment on these claims, arguing that Plaintiff cannot establish that he was subjected to unlawful disparate treatment based on his national origin, race, or ethnicity under Title VII, and that Plaintiff cannot establish that he was subjected to a hostile work environment. The Court finds that summary judgment is warranted on the disparate treatment claim, but not the hostile work environment claim.

##### i.   *Disparate Treatment*

Title VII disparate treatment claims are analyzed under the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). To demonstrate a *prima facie* case of discrimination, a plaintiff must show that: (i) he is a member of a protected class; (ii) he was qualified for the position he held; (iii) he suffered an adverse employment action; and (iv) the circumstances of the adverse employment action give rise to an inference of discrimination. *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 241 (3d Cir. 2007). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant-employer to

provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant-employer meets this burden, the plaintiff must then prove by a preponderance of evidence that the legitimate reason provided by the defendant-employer is simply a pretext for discrimination. *Id.* To show pretext, "a plaintiff must submit evidence which: (i) casts doubt on the legitimate reason proffered by the employer such that a factfinder could reasonably conclude that the reason was a fabrication; or (ii) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination." *Id.* at 242.

Innodata does not dispute that Dey can establish elements one and three of his *prima facie* case: Dey is of Asian ethnicity and Indian nationality, which makes him a member of a protected class, and Dey's termination constitutes an adverse employment action. However, Innodata contends that Dey was not qualified for the position he held, and that the circumstances of his termination do not give rise to an inference of discrimination. (D.E. No. 104-1 ("Def. Mov. Br.") at 10–12).

As to qualifications, Innodata argues that Dey's supposedly poor performance shows he was not qualified for his role as Client Partner. (*Id.* at 10–11). The Court disagrees. To determine whether a plaintiff was qualified for his position, the court applies an objective standard. *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990). Specifically, the court considers whether the plaintiff had the objective education and experience to qualify as a viable candidate for his position. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). And where, as here, the question is whether the plaintiff was qualified for the position that he actually held (rather than, for example, whether he was qualified for a promotion), recruitment and hiring by a defendant-employer can support the *prima facie* case, even in the face of poor performance evaluations. *See Weldon*, 896 F.2d at 798. Thus, Dey's employment as a Client Partner in the United States—after

8

he worked for two-and-a-half years in a similar sales position—supports that he was qualified for his position.

Next, Innodata argues that there is no evidence supporting an inference of discrimination. (Def. Mov. Br. at 11).  Plaintiff contends that Indovino's treatment of Dey is more than sufficient to support an inference of discrimination.  (Pl. Opp. Br. at 13).  On this score, the Court agrees with Defendant.

A plaintiff can show that the circumstances of an adverse employment action give rise to an inference of discrimination in various ways.  Such an inference is often presented in the form of evidence of disparate treatment, "whereby a plaintiff shows that [he or she] was treated less favorably than similarly situated employees" of a different race.  *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008).  An inference of discrimination can also be supported in a number of other ways, "including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by [his] supervisors suggesting racial animus."  *Golod v. Bank of America Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010).  Although no precise type of disparate treatment is necessary to establish a claim of discrimination, a plaintiff "must establish some causal nexus between his membership in a protected class and the [adverse employment action]."  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003); *Jasmin v. New Jersey Econ. Development Auth.*, No. 16-1002, 2020 WL 3411171, at *13 (D.N.J. June 22, 2020).

Dey seems to suggest that the fact that he was terminated following his complaints about discrimination is evidence of an inference of discrimination.  (Pl. Opp. Br. at 8).  But this argument seems to conflate the issue whether Dey was fired because of his complaints (*i.e.*, in retaliation for his complaints) with the question whether he was fired because of his status in a protected class.

Dey otherwise suggests that his evidence of Indovino's "racially-based critiques and commentary directed at him" suffices to show an inference of discrimination with respect to his termination. (*Id.* at 8 & 13). But fatal to Dey's prima facie discrimination case is a lack of evidence linking Indovino and her racially-based critiques and comments to Innodata's decision to terminate Dey. Dey does not dispute that Indovino did not make the decision to terminate Dey. (Pl. Resp. SUMF ¶ 85; Weber Decl., Exhibit 13 at 72:1–22). Thus, even if Indovino's comments and behavior are evidence of *her* discriminatory animus, alone, they do not show a causal connection between Dey's membership in a protected class and his termination. *See Jenkins v. Inspira Health Network, Inc.*, No. 15-2922, 2018 WL 1535208 at *9 (D.N.J. Mar. 29, 2018) (stating that comments made by a non-decisionmaker were insufficient to create an inference of discrimination).

Accordingly, the Court finds that Dey has not put forth sufficient evidence to suggest an inference of discrimination surrounding the circumstances of his termination. Therefore, Dey has not established a *prima facie* case of discrimination based on disparate treatment, and Innodata is entitled to summary judgment on this claim.

### ii.        *Hostile Work Environment*

Title VII also prohibits harassment that creates a hostile working environment. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). To establish a *prima facie* case of a hostile work environment a plaintiff must show that: (i) he suffered intentional discrimination because of his status in a protected class; (ii) the discrimination was severe or pervasive; (iii) the discrimination detrimentally affected him; (iv) the discrimination would detrimentally affect a reasonable person in like circumstances; and (v) the existence of *respondeat superior* liability. *Id.* Innodata argues that the majority of Dey's allegations, at best, evidence a "personality clash," and none of Indovino's national origin-based comments are sufficiently severe or pervasive to meet

the standard for actionable harassment.  (Def. Mov. Br. at 16–17).  Innodata also argues that even

if Dey found his work environment to be hostile, Dey has not shown that a reasonable person in

the same protected class would perceive the environment as hostile.  (*Id.* at 17).  The Court views

these arguments as challenging whether Dey has sufficient evidence of elements one, two, and

four of his hostile work environment claim and will consider each in turn.

As a preliminary matter, the Court rejects Innodata's efforts to separate Dey's allegations

into two buckets—those that are not explicitly motivated by race or national origin (such as

Indovino's tone and criticisms) and Indovino's national origin-based comments—and evaluate the

evidence separately.  Innodata seems to suggest that the Court should disregard the former category

of allegations because they evidence mere disagreement and a personality clash among Indovino

and Dey.  And such allegations, Innodata says, cannot change a claim into a hostile work

environment claim simply because Dey is a member of a protected class.  (*Id.* at 16).  However,

as the Third Circuit has explained, "the advent of more sophisticated and subtle forms of

discrimination requires that we analyze the aggregate effect of all evidence and reasonable

inferences therefrom, including those concerning incidents of facially neutral mistreatment, in

evaluating a hostile work environment claim."  *Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d

Cir. 2001).

Considering the evidence in the aggregate, the Court finds that Dey has put forward enough

evidence to create a genuine issue of material fact on the issue whether Indovino was motivated

by animus based on Dey's race or national origin.  Dey claims that Indovino made derogatory

comments related to ethnicity and national origin when she commented on the inability of the

Asian operations team to conduct business coherently, stated that she loathes the fact that the

delivery centers are in Asia and that this location was the core of the problem, stated that she "can

barely understand" what the offshore teams say on phone calls, and on one occasion, as Dey was in the middle of an explanation, she complained that "this explanation is too long and you Indians have no ability to speak in short sentences clearly." (Def. Resp. SUMF ¶¶ 18, 19, 22 & 24). In addition, Dey states that Indovino generally mistreated him by, *inter alia*, criticizing him, yelling at him, using a hostile, degrading, derogatory and intimidating tone, and categorically shutting down his suggestions. (*Id.* ¶¶ 17, 20–22 & 24). Viewing these facts in totality, a reasonable fact-finder could conclude that all of the mistreatment, including the facially neutral conduct, was related to Dey's race or national origin. *See Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 76 (3d Cir. 2003) ("[I]n light of these two comments, a reasonable fact-finder could find that all the facially neutral mistreatment of [plaintiff] by other members of the management team was related to race.").

To be sure, Innodata challenges Dey's version of the facts, including whether Indovino made some of the alleged comments and whether she was generally hostile towards Dey or other employees. (Def. Resp. SUMF ¶¶ 17–24). In support, Defendant cites to the results from the Verita Report, which it claims did not corroborate any of Dey's allegations, and to the testimony of other Innodata employees who gave different accounts of what happened. (*Id.*). But the Court must view the record in the light most favorable to the non-moving party, and it is for a jury to weigh the competing evidence and decide which version of the facts to believe. *See Brown v. Joel Tanis & Sons, Inc.*, No. 13-2984, 2016 WL 3951378, at *5 (D.N.J. July 21, 2016) ("At bottom, resolution of these claims will require credibility determinations and the weighing of evidence, both functions that are clearly within the province of the jury.").

Having considered discriminatory motive, the Court turns to the question whether the discrimination was severe or pervasive. The threshold for showing severe or pervasive

discrimination is high.  *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014).  A hostile work environment is actionable under Title VII only if it is so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive working environment.  *Id.* The situation must be objectively hostile, not merely hostile according to the plaintiff.  *Id.*  To determine whether a work environment is sufficiently hostile to be severe or pervasive, the Court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (quotation marks and internal citations omitted).

As set forth *supra*, Dey bases his hostile work environment claim on Indovino's overall treatment of him and derogatory comments directed at Dey and the offshore teams.  (Def. Resp. SUMF ¶¶ 17–24).  As to the frequency of this conduct, Dey has put forward evidence that Indovino's conduct occurred "ever since [she] joined Innodata," which was around April 2016, and that the conduct "came to a head" in September 2016.  (Def. Reply SUMF ¶ 34; Abuhoff Decl., Exhibit G at 54 (ECF Pagination); D.E. No. 104-3, Weber Decl., Exhibit 12 at 18:4–15). And according to Dey, the harassment continued after the Verita investigation, after his brief medical leave, and up to his termination in December 2016.  (Pl. Supp. SUMF ¶ 54 ("Upon his return to work on or about November 20, 2016, Indovino continued her harassment, increased scrutiny and chang[ed] in her performance appraisal of Dey.").  It is not entirely clear whether, during this eight-month period from April to December 2016, the complained-of conduct occurred daily, weekly, monthly, or at some other frequency.  However, a reasonable juror could conclude that the discrimination occurred frequently during this time period.  (*See* Abuhoff Decl., Exhibit

G at 54 (Dey's September 12, 2016 email to Mr. Abuhoff, in which Dey says that Indovino verbally berated him and screamed at him "for every action [he] took"); *id.* at 54–55 (Dey listing examples of the alleged conduct occurring in June, July, August, and September of 2016); *id.* at 55 ("For each proposal that I bring to [Indovino's] notice she directs open ridicule at how I work. . . "); *id.* (describing a "relentless barrage" of verbal abuse); Pl. Supp. SUMF ¶¶ 20–24 (describing Indovino's general tone and attitude towards Dey and stating that Indovino criticized Dey on "numerous" occasions and "continuously" stated that she loathes the fact that Innodata's delivery centers are in Asia)).

As to the severity and nature of the conduct, the Supreme Court has explained that "offhand comments" and "isolated incidents (unless extremely serious)" will not amount to "discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Moreover, mere offensive utterances are not enough to create a hostile work environment, even if they produce offensive feelings for an employee. *Greer*, 590 F. App'x at 173. Innodata suggests that the comments made by Indovino are more akin to mere offensive utterances and offhand comments and are not sufficiently severe or pervasive in quantity or nature to meet the standard for actionable harassment. (Def. Mov. Br. at 16). If the Court were viewing Indovino's national origin-based comments in isolation, Innodata might be correct. But the Court cannot ignore Indovino's facially neutral behavior when considering the severity or pervasiveness of the conduct. Dey's version of the facts is that his immediate supervisor discriminated against him because of his race and/or national origin. Her discriminatory motive, according to Dey, is evidenced by the national origin-based comments she made to him and to others. And the discriminatory conduct included not only the national origin-based comments, but also repeated and regular mistreatment. A reasonable juror could find that the national origin-based comments,

14

when combined with the facially neutral conduct, constituted severe and humiliating conduct and/or pervasive and regular conduct which altered the conditions of Dey's employment.

The same considerations permeate the issue whether the discrimination would detrimentally affect a reasonable person in like circumstances. On this score, Defendants offer the fact that other witnesses of Indian national origin—who also reported to Indovino and had the opportunity to witness Indovino and Dey interact—did not observe Indovino treat Dey in a manner they thought was unprofessional or derogatory and did not feel that Indovino was hostile or critical of their suggestions or of the suggestions of people in their offices. (Def. Mov. Br. at 17–18 (referring to the results from the Verita Report)). But such evidence does not establish the non-existence of material issues of fact; to the contrary, it suggests there are disputes of material fact that must be resolved by a jury. *See Streater v. City of Camden Fire Dep't*, 567 F. Supp. 2d 667, 676 (D.N.J. 2008) (noting that "the Court's capacity to weigh evidence at the summary judgment stage is almost nil," even where "[t]he facts offered by [p]laintiff seem weak and largely uncorroborated by the experiences of others working in the same environment").

In sum, considering the totality of the circumstances, the Court finds that there are issues of fact that preclude granting Defendant's motion for summary judgment on this claim.

**B.      Violation of the Americans with Disabilities Act**

Dey's claim that Innodata violated the ADA is based on Innodata's failure to provide reasonable accommodations for Dey when he returned to work after taking medical leave for a silent heart attack. (Compl. ¶¶ 57–64; Pl. Opp. Br. at 22). Innodata maintains that it is entitled to summary judgment on this claim because, *inter alia*, Dey failed to exhaust administrative remedies. (Def. Mov. Br. at 18–20). The Court agrees with Innodata.

Before filing a complaint, a plaintiff alleging discrimination under the ADA must exhaust his administrative remedies by filing a charge with the EEOC.  *Williams v. E. Orange Cmty. Charter Sch.*, 396 F. App'x 895, 897 (3d Cir. 2010) (citing 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a)).  If a claim is omitted from an EEOC charge and does not involve the same type of discrimination as that which was submitted for investigation, the omitted claim is not properly exhausted and must be dismissed.  *See Cunningham v. Burlington Coat Factory Warehouse Corp.*, No. 18-11266, 2019 WL 4786016, at *5 (D.N.J. Sept. 30, 2019) (noting that "an ADA action brought in a district court is constrained to the scope of the EEOC charge," and that additional claims can be added to the complaint only if "they fall within the scope of the EEOC Charge").

Dey does not dispute that his initial EEOC charge did not include an ADA claim.  Rather, he argues that the exhaustion requirement is met because he raised the ADA claim in his reply papers to the EEOC on April 17, 2017.  (Pl. Opp. Br. at 21–22).  Dey suggests that the following sentence from his reply is sufficient to exhaust the issue: "His termination occurred, tellingly, two days after Innodata became aware of the EEOC charge and just a month after heart surgery which was necessitated by the stress created by the discrimination and subsequent cover up."  (*Id.* at 22; D.E. No. 107-3, Nitschke Decl., Exhibit K at 136 (ECF Pagination)).  However, even assuming a claim can be exhausted through a reply submission, the cited sentence did not have that effect here because it mentions neither the ADA nor a failure to provide reasonable accommodations.  And Dey's reply is otherwise focused on his Title VII claims.  (*See generally* Nitschke Decl., Exhibit K).  Moreover, the EEOC made no mention of any disability discrimination in its May 2, 2017 correspondence to Dey which notified him of the conclusion of the EEOC investigation, provided him with a Notice of Dismissal and Right to Sue, and explicitly states "[y]ou allege you were discriminated against because of National Origin-East Indian, Retaliation, Race-Asian."  (Weber

16

Decl., Exhibit 1 (Exhibit E)).   Based on the foregoing, the Court cannot agree that Dey sufficiently exhausted his ADA claim.   *See Carter v. N.J. Dep't of Hum. Servs.*, No. 18-12469, 2020 WL 3427986, at \*5 (D.N.J. June 23, 2020) (dismissing ADA claim for failure to exhaust where plaintiff's EEOC letter of dismissal and notice of right to sue only pertained to employment discrimination and retaliation).

Dey further contends that even if he never exhausted the ADA claim, Innodata waived any argument based on failure to exhaust.   Dey cites to *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1851 (2019), for the proposition that the ADA exhaustion requirement is a claims processing rule, not a jurisdictional one, and therefore "employers must promptly raise any exhaustion-related defenses or risk waiver."   (Pl. Opp. Br. at 21–22).   *Davis* involved claims of religion-based discrimination and retaliation for reporting sexual harassment.  139 S. Ct. at 1847–48.   The district court granted the defendant's motion for summary judgment, and the case was appealed to the Fifth Circuit, which affirmed as to the retaliation claim but reversed as to the religious-based discrimination claim.   *Id.* at 1848.   Defendant filed a petition for certiorari, but that petition was denied.   *Id.*   When the case returned to the district court—now years into the litigation—the defendant moved to dismiss the complaint raising, for the first time, an exhaustion defense.   *Id.* The district court granted the motion, but the Fifth Circuit reversed, concluding that Title VII's exhaustion requirement is not jurisdictional, and that the defendant forfeited any exhaustion-based argument by not raising it until after an entire round of appeals all the way to the Supreme Court. *Id.*   The Supreme Court granted certiorari to resolve a conflict among the Circuit Courts over whether the requirement was in fact jurisdictional.   *Id.*   The Supreme Court concluded that Title VII's charge-filing requirement is a mandatory processing rule, but it is "not a jurisdictional

prescription delineating the adjudicatory authority of courts" and affirmed the Fifth Circuit's judgment. *Id.* at 1851–52.

While Dey is correct that a failure to exhaust argument can be waived, the Court is not persuaded that Innodata has waived that argument here.  As another judge in this District has explained, "the Third Circuit has 'taken a more forgiving approach to parties who fail to raise affirmative defenses in an answer, as courts have held that the failure to raise an affirmative defense by responsive pleading or appropriate motion does not always result in waiver.'"  *Cevdet Aksut Ve Ogullari Koll. Sti v. Cavusoglu*, No. 12-2899, 2016 WL 231018, at \*5 (D.N.J. Jan. 19, 2016) (quoting *Sultan v. Lincoln Nat. Corp.*, No. 03-5190, 2006 WL 1806463, at \*13 (D.N.J. June 30, 2006)).  Here, although Innodata did not specifically raise a failure to exhaust defense in its answer, it did assert a general defense under Federal Rule of Civil Procedure 12(b)(6) that the Complaint "fails to state a claim upon which relief . . . can be granted." (D.E. No. 82 at 11); *Itiowe v. NBC Universal Inc.*, 556 F. App'x 126, 128 (3d Cir. 2014) ("[N]on-exhaustion constitutes a ground for dismissal for failure to state a claim on which relief may be granted under Fed. R. Civ. Pro. 12(b)(6).").  And although Innodata filed a motion to dismiss or transfer based on improper venue, it did not file a motion pursuant to Rule 12(b)(6).  In other words, this summary judgment motion was the first motion Innodata filed to address the merits of Dey's claims.  Thus, this case is unlike *Davis* where the defendant failed to raise the argument in its initial summary judgment motion and through an appeal to the Supreme Court.   Based on the foregoing, the Court finds that Defendant did not forfeit its right to raise the argument, and

Plaintiff's ADA claim is barred.[5]

### C.     State Law Claims

Preliminarily, Innodata says "[d]espite Plaintiff's offer letter mandating that the terms of his employment and the resolution of any disputes be governed by New Jersey law, Plaintiff has brought three causes of action based in retaliation under Illinois law."  (Def. Mov. Br. at 20). Innodata continues that "even applying Illinois law, all three causes of action must be dismissed." (*Id.*).  Innodata's argument seems to be that Dey should have brought New Jersey state law claims, not Illinois state law claims.  However, aside from mentioning the offer letter (and, in its reply brief, the forum selection clause), Innodata does not argue that the Illinois state law claims should be dismissed on these grounds.  In any event, it is not clear that the offer letter—which provides that "[t]he terms of this Offer of Employment and the resolution of any disputes will be governed by New Jersey law"—should be read expansively to apply the substantive law of New Jersey to any and all disputes between the parties, even if they are unrelated to the terms of the offer of employment.  (*See* Abuhoff Decl., Exhibit D at 17 (ECF Pagination)).  And the referenced forum selection clause merely provides for the parties' consent to venue in New Jersey.  (D.E. No. 113-2, Weber Reply Decl., Exhibit 1 ¶ 6).  The Court thus addresses these claims on the merits under Illinois law.

---

[5]     Even if this claim was not barred, there appear to be a number of issues with the claim.  The basis of the claim and what evidence supports it is not entirely clear.  In the Complaint, Dey claims that Innodata did not provide him with a reasonable accommodation and that "Defendant unlawfully terminated the Plaintiff due to his medical condition."  (Compl. ¶¶ 60–63).  The relevant medical condition is Dey's status post-heart attack.  At the outset, it is not clear how Dey's status post-heart attack qualifies him as an "individual with a disability" under the ADA.  Nor is it clear what evidence supports an assertion that Innodata terminated Dey *because of* his medical condition.  As to the requested accommodation, Dey claims that after his heart attack he requested that "Indovino eliminate and/or reduce her abusive nature towards Dey given that the stress she imposed on him caused his heart attack," and that "his interactions with Indovino be limited."  (Pl. Opp. Br. at 22).  But these requests appear to be unreasonable as a matter of law.  *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998) (requested accommodation unreasonable as a matter of law where it would essentially require the court to set conditions of employment and depend on variables outside of employer's control).

### i.      Retaliation under the IHRA

Under 775 ILCS 5/6-101(A) of the IHRA, it is a civil rights violation to retaliate against a person because he opposed what he believed in good faith to be unlawful discrimination or because he made a charge or filed a complaint of unlawful discrimination.  Illinois courts apply the Title VII framework in analyzing retaliation claims under the IHRA.  *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).  "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action."  *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).[6]

There is no dispute that the first and second elements of Dey's retaliation claim are met: Dey made an internal complaint against Indovino and filed an EEOC charge, and subsequently was terminated.  To demonstrate the third element—a causal link—Dey must show that but for his complaints against Indovino, he would not have been terminated.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Weller v. Paramedic Servs. of Illinois, Inc.*, 297 F. Supp. 3d 836, 846 (N.D. Ill. 2018).  But-for causation does not mean that the protected activity must have been the only cause of the adverse action, but it means that the adverse action would not have happened without the activity.  *Weller*, 297 F. Supp. at 846 (quoting *Carlson v. CSX Transp., Inc.*,

---

[6]      The burden-shifting framework of *McDonnell Douglas* is another "viable method of organizing and assessing evidence."  *Vesey v. Envoy Air, Inc.*, No. 18-4124, 2019 WL 12337658, at *3 n.4 (C.D. Ill. Dec. 20, 2019); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019).  "That method allows the plaintiff to establish a prima facie case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity."  *Lewis*, 909 F.3d at 866.  This method is not a separate legal standard, but rather is just a different way to consider whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's protected activity caused the adverse employment action.  *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  Because Dey does not attempt to prove causation through evidence of treatment of similarly situated employees, the Court uses the framework for its analysis outlined *supra*.

758 F.3d 819, 828 n.1 (7th Cir. 2014)).  There are many ways to prove a causal link, including by evidence of "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual."  *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

Innodata does not dispute the temporal proximity between Dey's complaints—first to Abuhoff on September 12, then to the EEOC on November 8—and his firing on December 21. (Def. Mov. Br. at 21).  However, Innodata correctly argues that temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient, on its own, to show that the former caused the latter.  (*Id.* (citing *Martinez v. Nw Univ.*, 173 F. Supp. 3d 777, 788 (N.D. Ill. 2016))).  And according to Innodata, Dey fails to point to any other evidence to support the causation requirement and/or to rebut Innodata's proffered reason for termination—Dey's poor performance.  (*Id.* at 21–22).  The Court disagrees.

In addition to temporal proximity, Plaintiff has put forward evidence that Defendant's proffered reason for termination is pretextual.  "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer."  *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008).  "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge."  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011).  Thus, to show pretext, the employee "must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions'" in the employer's proffered reason "'that a reasonable person could find [it] unworthy of credence.'"  *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (alteration in original) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

In support of his argument that Innodata's proffered reason for his termination—poor performance—was pretextual, Dey maintains that all alleged poor performance allegations came *after* his complaint to Abuhoff about Indovino. (Pl. Opp. Br. at 25–26). In particular, Dey argues that his supervisors never expressed problems with his performance prior to his complaint to Abuhoff, and that any issues with his performance started being charted on September 19, 2016, a week after he made his complaint against Indovino. Dey's argument has support in the record.

Innodata cites to various declarations and exhibits thereto to demonstrate poor performance.[7] But Dey points out potential weaknesses in this evidence, which could lead a reasonable juror to believe that Innodata's stated reason for termination was pretextual. To start, some of the evidence is disputed. (*See, e.g.*, Def. Reply SUMF ¶ 18 (Defendant citing to Abuhoff's testimony that in early 2014 he and Dey discussed Dey's pipeline for new business being insufficient, and Dey citing to his own declaration for support that this discussion never happened)). Moreover, much of the evidence post-dates Dey's initial complaint to Abuhoff on September 12, 2016. (*See, e.g.*, Def. Reply SUMF ¶¶ 77–81 (describing issues after the Verita investigation); D.E. No. 104-5, Novero Decl., Exhibits A (October 2016 emails) & B (various email strings in late September, October, and December 2016); Abuhoff Decl., Exhibits K, L (September 23, 2016 correspondence) & M (November 1, 2016 correspondence[8])). Indeed, it was not until September 19, 2016, that Indovino created the spreadsheet of performance issues that Innodata relies on in support of its motion. (Novero Decl., Exhibit G; Def. Resp. SUMF ¶ 63).

---

[7]     Dey moves to strike Exhibits A–G of the Novero Declaration because they contain handwritten notes and highlights which Dey says constitute inadmissible hearsay. (Motion to Strike at 1). Dey's argument may have some merit, but the Court need not resolve this dispute because these documents do not change the Court's conclusion.

[8]     There are no identifying cover sheets for exhibits K through M of the Abuhoff Declaration, but the Court is able to identify each exhibit by referencing the description provided in the Abuhoff Declaration. (*See* Abuhoff Decl. ¶¶ 39–42). Using the pagination generated by the Court's electronic filing system, Exhibit K appears on pages 83–84; Exhibit L appears on pages 85–87; and Exhibit M appears on page 88. (D.E. No. 104-4 at 83–88).

*See, e.g.*, *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 197 (7th Cir. 1994) ("The record contains sufficient evidence that it was only after the July 7 incident that concerns arose regarding her status at the company.").

Although there is some other evidence that pre-dates Dey's initial complaint, that evidence has potential weaknesses, too.  Specifically, Innodata cites to several email communications between Dey and Indovino where, in sum, Indovino questioned Dey's business decisions, provided constructive feedback, and/or asks for additional information about Dey's strategy.  (Novero Decl., Exhibits C, D, E & F).  Although a reasonable juror could consider these communications as evidence of poor performance, a reasonable juror also could find this evidence unworthy of credence based on the fact that the person criticizing Dey is the same person who is accused of discriminating against him on the basis of his race.  *Dorvil v. Burlington Coat Factory Warehouse Corp.*, No. 09-5778, 2011 WL 4899976, at *5 (D.N.J. Oct. 14, 2011) (concluding that a jury could find pretext for termination where a performance plan was instituted by an individual who made discriminatory comments towards plaintiff on multiple occasions).  Moreover, it is not clear whether Indovino's concerns raised in these emails were elevated to human resources and/or to Abuhoff as "performance concerns" until after Dey's initial complaint about Indovino on September 12, 2016.  And it is equally unclear whether Indovino's comments were presented to Dey as performance concerns prior to his complaints.[9]  Indeed, it seems that the first (undisputed) performance-related discussion between Dey and Abuhoff took place in early November 2016, after the Verita investigation concluded.  (Abuhoff Decl., Exhibit J; D.E. No. 107-7, Dey Decl. ¶

---

[9]     Relatedly, although Dey does not dispute that his only commissions came from his sale with Book Dog Books in 2014, it is not clear whether this was perceived as a performance issue prior to Dey's complaints.  Indeed, as Dey points out, despite his lack of commissions, Innodata sponsored Dey's move to the United States in February 2016.

30).[10]  Thus, this case is unlike some others where the pre-complaint performance concerns were abundantly clear from the record.  *See, e.g.*, *Hellman v. Am. Water Works Serv. Co., Inc.*, No. 17-12961, 2020 WL 2189967, at *10 (D.N.J. May 6, 2020) ("Although Plaintiff received years of positive performance reviews from Mr. Li, she had also received multiple warnings from Hammer, both formally and informally, that he was unsatisfied with her work product."); *Hunter v. Deptford Bd. of Educ.*, No. 16-0727, 2019 WL 4786032, at *7 (D.N.J. Oct. 1, 2019) ("The undisputed evidence shows that the BOE received dozens of complaints about [p]laintiff's work performance from multiple sources, and that [p]laintiff was retrained on at least three occasions."); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) ("The undisputed facts make clear that Slavin fully informed Juarez of the deficiencies in her performance and gave her every opportunity to correct them.").

Taken together, the close timing between the protected activity and termination and the evidence Plaintiff has put forth to cast doubt on Defendant's proffered reason for termination would allow a reasonable fact finder to conclude that Dey's protected activity caused his termination or to infer Innodata's retaliatory motive.  Thus, Plaintiff has presented enough evidence to withstand Defendant's motion for summary judgment on his state law retaliation claim.[11]

---

[10]    On this score, Dey claims that Abuhoff's behavior towards him changed, as he suddenly became more critical of Dey's performance following the Verita investigation.  *See Morrill v. Nielsen*, No. 17-3419, 2018 WL 3141798, at *13 (N.D. Ill. June 27, 2018) (recognizing that a change in a supervisor's behavior can help show a causal connection).

[11]    Although not addressed by the parties, it is not clear whether this claim was adequately exhausted under Illinois law and, if not, whether such a failure to exhaust implicates jurisdictional concerns.  The Complaint and the briefing specifically address exhaustion as to Dey's federal claims but are silent as to the IHRA claim which appears to have a similar exhaustion requirement.  (Compl. ¶ 31; Def. Mov. Br. at 18); *see Doe 1 v. City of Chicago*, No. 18-3054, 2020 WL 1166222, at *4 (N.D. Ill. Mar. 11, 2020) ("The IHRA requires plaintiffs to exhaust their administrative remedies; a complainant may commence a civil IHRA action in court only after the IDHR issues a final order notice.").  To the extent the IHRA's exhaustion requirement applies and is a non-jurisdictional claims processing rule, Innodata has forfeited any argument based on a failure to exhaust.  *See Doe I*, 2020 WL 1166222, at *4–5 (concluding that exhaustion under the IHRA is non-jurisdictional and subject to forfeiture).  But as one Illinois District Judge has explained "courts in the Seventh Circuit appear divided as to whether a failure to exhaust administrative remedies

### ii.       *Illinois Whistleblower Act Claims*

Innodata also seeks summary judgment on Dey's claims under Sections 10 and 15 of the IWA.  The Court agrees with Defendant that summary judgment is warranted on the Section 10 claim but denies summary judgment on the Section 15 claim.

### 1.       <u>Section 10</u>

Section 10 of the IWA prohibits an employer from making, adopting, or enforcing any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency if the employee has a reasonable cause to believe that the information discloses a violation of a state or federal law, rule, or regulation.  740 Ill. Comp. Stat. Ann. 174/10. If there is no evidence that the defendant-employer had any formal policy or rule preventing employees from contacting government agencies about wrongdoing, a plaintiff must show that the employer was practicing an unrecorded policy with the same impact.  *See Diadenko v. Folino*, 890 F. Supp. 2d 975, 993 (N.D. Ill. 2012), *aff'd*, 741 F.3d 751 (7th Cir. 2013).  Innodata contends that it never enforced any policy designed to prevent Dey or its employees from disclosing alleged unlawful conduct to a government agency.  The Court agrees that there is insufficient evidence to support this claim.

It is not clear what rule, regulation, or policy—whether it be formal or informal—Dey relies on to support his Section 10 claim.  Dey argues that, although Innodata had written policies regarding equal employment and harassment, "[d]efendant failed to enforce its policy designed to protect its employees when disclosing unlawful conduct to a governmental agency."  (Pl. Opp. Br. at 26–27).  He further argues that, instead of enforcing its policy, Innodata "punished its employee

---

under the IHRA deprives federal courts of subject matter jurisdiction."  *Baranowska v. Intertek Testing Servs. NA, Inc.*, No. 19-6844, 2020 WL 1701860, at *2 n.3 (N.D. Ill. Apr. 8, 2020) (collecting cases).  Thus, to assure that it has jurisdiction over the IHRA claim, the Court requests supplemental briefing on the issue, as set forth in the accompanying Order.

for doing just that" and "engag[ed] in intimidation to prevent reporting of discrimination." (*Id.* at 26).  For support, Dey cites to the fact that Abuhoff started treating him differently after he complained on September 12, 2016, and he claims that the formal investigation was merely pretext to prevent Dey from filing an EEOC complaint.  (*Id.* at 26–27).

Even if Dey has evidence to support these contentions, his argument misses the mark.  Dey has not pointed to an official rule, regulation, or policy that would have prevented him from filing a charge of discrimination.  Nor does he explain how any of the conduct he experienced amounted to the enforcement of some unwritten policy meant to prevent him from doing so.  *See Diadenko*, 890 F. Supp. 2d at 993 (holding that summary judgment for defendant-employer was warranted because there was no evidence of any formal policy preventing employees from contacting government agencies about wrongdoing and there was insufficient evidence that defendant-employer enforced or maintained any unwritten policy to the same effect).  Accordingly, the Court finds that Innodata is entitled to summary judgment on this claim.

## 2. <u>Section 15 of the IWA</u>

Section 15 of the IWA prohibits an employer from retaliating against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a state or federal law, rule, or regulation.  740 Ill. Comp. Stat. Ann. 174/15.  Dey claims that Innodata violated Section 15 by terminating Plaintiff in retaliation for his EEOC charge.  Innodata argues that it is entitled to summary judgment on this claim because there is no evidence of retaliatory motive concerning Dey's termination.  (Def. Mov. Br. at 23).  The Court finds that material factual disputes preclude entry of judgment on this claim.

Dey filed his EEOC charge on November 8, 2016, and he was fired just over a month later on December 21, 2016.  Innodata contends that when Dey was terminated, Abuhoff, the decisionmaker in Dey's termination, had not seen Dey's EEOC charge.  (Def. Mov. Br. at 23–24).  Dey does not necessarily dispute that Abuhoff had never *seen* the EEOC charge, but he proffers evidence to suggest that Abuhoff was aware of the EEOC charge.  Specifically, at Abuhoff's deposition, Abuhoff testified that he did not recall when he became aware of the EEOC complaint and stated that during the December 21, 2016 termination phone call, he did not remember that Dey filed an EEOC complaint until Dey's attorney raised it; at that point, Abuhoff said, he "recall[ed] feeling like maybe I made a mistake, that maybe I shouldn't have terminated him because frankly I had forgotten about that EEOC thing."  (Pl. Resp. SUMF ¶ 84; Weber Decl., Exhibit 12 at 76:5–77:8).  Although this testimony may not conclusively establish that Abuhoff knew of the EEOC charge at the time of the termination, Abuhoff's testimony suggests that he was aware of it at some point before the termination but forgot about it.  And whether or not Abuhoff knew of the EEOC charge at the time of termination is material to whether Dey was fired because of his EEOC charge.

Moreover, as discussed in Section III.C *supra*, the other arguments proffered by Innodata— that they had non-retaliatory reasons for terminating Dey—similarly involve material factual disputes that presently are not suitable for resolution.  Accordingly, Plaintiff has presented enough evidence to withstand Defendant's motion for summary judgment on this claim.

### iii.    *Common Law Retaliatory Discharge Claim*

To prove a common law retaliatory discharge claim, a plaintiff must show that he was (i) discharged; (ii) in retaliation for his activities; and (iii) the discharge violates a "clearly mandated public policy."  *See Turner v. Mem'l Med. Ctr.*, 911 N.E. 2d 369, 374 (Ill. 2009).  The Court has

already discussed the first two elements in connection with Dey's other claims.  To satisfy the third element, a plaintiff must point to the specific source of the clearly mandated public policy.  *See id.* at 376.  Importantly, the source of the mandated public policy cannot be the IHRA because of the IHRA's preemption mechanism.

Specifically, the IHRA sets out an administrative procedure for certain civil rights claims and specifies that "no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act."  775 Ill. Comp. Stat. 5/8-111(D).  Thus, the IHRA preempts claims where the basis for the claim arises from a matter covered under the IHRA, unless the plaintiff can establish a basis for imposing liability on defendants outside of the Act. *Nelson v. Realty Consulting Servs., Inc.*, 431 F. App'x 502, 506–07 (7th Cir. 2011) (citing *Blount v. Stroud*, 904 N.E.2d 1, 10 (Ill. 2009)); *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997) (stating that courts should look at whether the claim is "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself").

Innodata argues that Dey fails to provide an independent basis for imposing liability beyond the IHRA.  (Def. Mov. Br. at 20).  But in response, Dey clarifies that his common law discharge claim is based on "his whistle-blowing activities of filing an EEOC [c]laim," and therefore Dey relies on the "clearly mandated public policy" embodied in the IWA.  (Pl. Opp. Br. at 24).  Importantly, the IHRA does not preempt claims brought under the IWA where, as here, those claims are based on retaliation for disclosing a violation of federal law.  *See Torres v. Merck Sharp & Dohme Corp.*, 255 F. Supp. 3d 826, 832–33 (N.D. Ill. 2017) ("[Plaintiff] thus is not calling upon the Human Rights Act to undergird his Whistleblower Act claim in any way.  He is instead arguing that there was a breach of federal law reported to a federal agency, and that [defendant] later retaliated on that basis.  That retaliation, in turn, violates the state Whistleblower Act.  No

28

mention of the Illinois Human Rights Act is needed at all, so there is no preemption.").  It follows, then, that no mention of the IHRA is needed for a common law retaliatory discharge claim based on the same conduct underlying a non-preempted IWA claim.  Moreover, as one Illinois District Court has noted, "several Illinois lower courts as well as federal courts have rejected the notion that the IWA abrogated, preempted, or repealed otherwise existing common law retaliatory discharge claims." *Van Pelt v. Bona-Dent, Inc.*, No. 17-1128, 2018 WL 2238788, at *7 n.1 (N.D. Ill. May 16, 2018) (collecting cases).  Thus, Dey's common law retaliatory discharge claim survives because it is premised on the public policy embodied in the IWA—not the IHRA—and the IWA does not preempt such a claim.[12]

### D.   Economic Damages

Innodata claims that it should be awarded summary judgment because "Plaintiff has not introduced any evidence of damages he can recover from a jury at trial."  (Def. Mov. Br. at 24). In support, Innodata argues that (i) because Dey has failed to establish a prima facie case for any of his claims, the Court need not consider whether there is evidence to support emotional distress damages; (ii) any damages Dey could have suffered are "entirely negated by Plaintiff's new role and corresponding compensation"; and (iii) Dey cannot recover any damages related to his purported heart attack because such an injury is a workplace injury and New Jersey's Workers' Compensation law is his exclusive remedy.  (*Id.* at 24–25).

The Court rejects Innodata's first argument because it is premised on the Court finding that Innodata is entitled to summary judgment on each of Dey's claims.  But as set forth in this Opinion, some of Dey's claims survive summary judgment.  Innodata's second argument pertaining to mitigation of economic damages is unpersuasive because it ignores that Dey seeks more than

---

[12]      It may be the case that Dey's common law retaliatory discharge claim is duplicative of his IWA claim, and that he may not permissibly recover separate damages for such a claim.  Innodata has not advanced such an argument.

simply lost wages for wrongful discharge.  (*See* Compl. ¶¶ 56, 78 & 88–89).  Thus, even if Dey's earnings from his new job offset certain damages for wrongful discharge, Innodata does not argue whether and how such earnings can offset any other damages.

Lastly, Innodata argues that Dey cannot recover any damages related to his heart attack because he has alleged that his heart attack was the direct and proximate result of ongoing abuse and harassment by Innodata, and therefore his exclusive remedy is under New Jerseys' Workers' Compensation Law.  (Def. Mov. Br. at 25).  Defendant cites to *McDaniel v. Man Wai Lee*, 17 A.3d 816, 820 (N.J. Super. Ct. App. Div. 2011), for the premise that the statute's exclusivity bar prohibits an injured employee's legal action to recover for injuries caused by fellow employees. But the New Jersey Supreme Court recently explained, "it is understood that state workers' compensation exclusivity provisions do not bar claims brought under federal civil rights laws."  *Richter v. Oakland Bd. of Educ.*, 252 A.3d 161, 182 n.4 (N.J. 2021), *as modified* (June 15, 2021); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1190 (2d Cir. 1987) ("[W]e do not read the workers' compensation law to deny relief under a federal statute.  Were state law to erect such a bar, it would clearly run afoul of the Supremacy Clause of the U.S. Const. Art. VI, cl. 2." (internal citations omitted)).  Thus, at minimum, Dey can assert his heart attack related damages in connection with the surviving Title VII claim, notwithstanding the exclusivity bar.

To be sure, whether Dey can prove all of the damages he claims remains to be seen.  But for purposes of this summary judgment motion, Innodata has not sufficiently demonstrated that it is entitled to summary judgment on all of Dey's claims due to lack of damages.

### E.  Counterclaims

Finally, Innodata argues that it is entitled to summary judgment on its counterclaims.  (Def. Mov. Br. at 25).  Those claims, sounding in breach of contract, unjust enrichment, and promissory estoppel, are based on Dey's alleged failure to repay the $6,250.00 loan from Innodata.

To establish a breach of contract claim, a party must show the existence of a contract, breach, and damages.  Dey does not dispute the existence of a contract between the parties:  he admits that Innodata loaned him $6,250.00 to assist with his move to the United States; and that in exchange, he signed the Promissory Note, agreeing to repay the loan with interest at the rate of 3.5% per annum on the unpaid balance.  (Pl. Resp. SUMF ¶¶ 22–25).  Nor does Plaintiff dispute that while he was employed at Innodata, the Promissory Note was due and payable in 48 equal installments of $135.00, payable twice monthly as an automatic salary reduction from each period beginning March 2016.  (*Id.* ¶ 26).  And the parties also agree that the Promissory Note became immediately due and payable if Innodata no longer employed Dey, for any reason, whether voluntary or involuntary.  (*Id.* ¶ 27).

With respect to breach and damages, Dey does not seem to dispute that there is some unpaid portion of the loan remaining.  Instead, he argues that there is a lack of evidence with respect to how much was deducted from his paycheck and that "any claims that monies are owed is simply a red-herring this Court should not entertain." (Pl. Opp. Br. at 30).  But contrary to Dey's assertion, Innodata has provided copies of Dey's bi-monthly pay stubs from February 29, 2016, to November 15, 2016, which show that beginning in March 2016, Innodata deducted $135.01 from each of Dey's paychecks in accordance with the terms of the Promissory Note.  (D.E. No. 113-5, Weber Reply Decl., Exhibit 4).  As of November 15, 2016, the paystubs show that a total of $2,295.17 had been deducted from Dey's paychecks in connection with the loan.  (*Id.* at 15 (ECF

Pagination)).  Based on these paystubs, it appears that, as of November 15, 2016, Dey still owed $3,954.83 on the principal amount of the Promissory Note.  And Dey does not put forward any evidence to rebut the fact that there is indeed an outstanding balance on the loan, *i.e.*, that he is in breach of his obligation under the Promissory Note, and that Innodata has suffered damages as a result.

The Court briefly considers Dey's argument that Innodata waived its right to collect on the Promissory Note because it failed to deduct the amount owed from Dey's final paycheck.  (Pl. Opp. Br. at 29).  Although the Promissory Note states that any amounts owed would be *subject to* set-off against final sums due to Dey from Innodata, the Promissory Note does not limit Innodata's right to recover to setoff.  (*See* Abuhoff Decl., Exhibit C).  Moreover, as Plaintiff's cited case law makes clear, "[w]aiver involves the intentional relinquishment of a known right and must be evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based."  *Scibek v. Longette*, 770 A.2d 1242, 1249 (N.J. Super. Ct. App. Div. 2001); *Hilal v. Dongyoun Han*, No. A-6004-17T2, 2019 WL 3521522, at *3 (N.J. Super. Ct. App. Div. Aug. 2, 2019) ("A party waives its right to enforce a contract provision if it consistently acts in such a way as to indicate that it does not intend to hold the other contracting party to that provision.").[13] Innodata's failure to set off the amounts owed on the Promissory Note from Dey's final paycheck does not amount to the type of "clear, unequivocal and decisive act" necessary to show an intention to relinquish a right.  Indeed, Innodata's other actions—including the immediate request for payment by letter dated December 21, 2016, and its subsequent assertion of counterclaims in this action to recover the unpaid sums—demonstrate an intention to hold Dey to his promises, not the

---

[13]    There is no dispute that the terms of the Promissory Note are governed by New Jersey law.  (*See* Promissory Note at 1 ("This Note . . . shall be construed, governed and enforced in accordance with the laws of the State of New Jersey.")).

opposite.  (*See* Novero Decl., Exhibit I; D.E. No. 82).   Accordingly, Dey's argument regarding waiver is unpersuasive.

The Court notes, however, that the outstanding loan amount is not entirely clear.  Innodata submits that as of December 21, 2016, the outstanding balance on the loan amount was $3,915.22 and that the balance as of June 15, 2020, was $4,258.42.  (Def. Mov. Br. at 7; Novero Decl. ¶¶ 15–16; Novero Decl., Exhibit I).  But elsewhere, Innodata claims that the outstanding balance of the principal loan amount is $3,780.22.  (Def. Mov. Br. at 27; D.E. No. 113, Def. Reply Br. at 15). But referring to the available paystubs, which end on November 15, 2016, it is not entirely clear how Innodata calculated either number.  Thus, while the Court finds that Innodata is entitled to summary judgment with respect to Dey's liability on the breach of contract claim, the Court does not make any determination as to the amount of damages Dey owes.[14]

Finally, because Defendant's other counterclaims for promissory estoppel and unjust enrichment are duplicative of the breach of contract claim, the Court does not address them.

## IV.    CONCLUSION

For the foregoing reasons, Innodata's SJ Motion is granted-in-part and denied-in-part. Dey's motion to strike is denied *without prejudice*.  An appropriate Order accompanies this Opinion.

*s/ Esther Salas*_____
**Esther Salas, U.S.D.J.**

---

[14]    Because the Court does not assess damages, the Court does not address Dey's argument that Innodata cannot recover attorneys' fees.  (Pl. Opp. Br. at 29).